## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOANNE PALAZZOLO, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : No. 10-CV-07430-JCJ |
| | : |
| DAVID C. DAMSKER, BUCKS COUNTY, | : |
| PENNSYLVANIA, BUCKS COUNTY, | : |
| PENNSYLVANIA HEALTH | : **JURY TRIAL DEMANDED** |
| DEPARTMENT, JOHN DOE, RITA ROE, | : |
| and all others acting in concert with them | : |
| and/or on their behalf, | : |
| | : |
| Defendants. | : |
| | : |

## MEMORANDUM OF LAW IN OPPOSITION TO
## MOTION FOR SUMMARY JUDGMENT

Plaintiff, Joanne Palazzolo, by her attorney, respectfully submits this Memorandum of

Law in Opposition to the Defendants' Motion for Summary Judgment.

## I.   FACTS

Mrs. Palazzolo's date of birth is February 10, 1956.  (Palazzolo Dep. 298) (Cited portions

of Ms. Palazzolo's deposition transcripts are attached as Exhibit "A.")  She became employed by

Bucks County as the Business Manager in the Health Department in January 2007.  (*Id.*)

Defendant Dr. David Damsker became the Director of the Health Department in 2008, at which

time he became Mrs. Palazzolo's immediate supervisor.  (Damsker Dep. 7, Funk Dep. 41)

(Cited portions of David Damsker's and Joseph Funk's deposition transcripts are attached as

Exhibits "B" and "C," respectively.)  Dr. Damsker's immediate supervisor was Joseph Funk and

Mr. Funk's immediate supervisor was Bucks County Chief Operating Officer, Brian

Hessenthaler.  (Damsker Dep. 15)

As Business Manager of the Health Department, Mrs. Palazzolo was the sole person responsible for the finances in the Health Department, other than the Director of the Health Department, that included, among other things, payroll expenditures.  (Palazzolo Dep. 116-117; Hessenthaler Dep. 27-28)  (Cited portions of Brian Hessenthaler's deposition transcript are attached as Exhibit "D.")

Throughout her employment in the Health Department, Mrs. Palazzolo repeatedly observed and reported instances of fraud and waste in connection with the time keeping practices of the Health Department that enabled, encouraged and caused employees falsely to report their hours worked in order to obtain monetary compensation or compensatory time off for those fraudulent hours.  (Palazzolo Dep. 23-48, 54-70, 86-92, 97, 99-131, 217-220, 255-256, 272-293, 300-302, 524-525).  She repeatedly reported the theft of time that was ongoing in the Health Department to Defendant Damsker as well as to Damsker's immediate supervisor, Joseph Funk, and to Mr. Funk's immediate supervisor, Brian Hessenthaler.  (*Id.*)

For example, in late 2009, Mrs. Palazzolo reported that a Health Department employee had taken vacation but received regular pay, not vacation pay, in violation of County policy.  (Hessenthaler Dep. 20-21; Funk Dep. 9-11).  Mr. Funk investigated Mrs. Palazzolo's report and he and Mr. Hessenthaler concluded that Dr. Damsker had indeed violated County policy by paying the employee regular pay.  (*Id.*)

On August 8, 2010, Mrs. Palazzolo reported to Mr. Hessenthaler various instances of fraudulent time theft in the Health Department based on her audit of three months of payroll records.  (Palazzolo Dep. 297, 422-432, 524-525, Palazzolo Dep. Exh. 15).  Mr. Hessenthaler then discussed the time theft issues raised by Mrs. Palazzolo with Joseph Funk, Dr. Damsker's immediate supervisor.  (Hessenthaler Dep. 18-19).  The following morning, Monday, August 9,

2010, Mrs. Palazzolo received a call from Mr. Funk in which Mr. Funk asked her why she had gone to Mr. Hessenthaler and stated that now, he would have to come to the Health Department office and deal with the matter.  (*Id.* 325-326).

After the telephone call between Mrs. Palazzolo and Mr. Funk on August 9, Mr. Funk visited the Health Department offices that day and met with Dr. Damsker in connection with theft of time issues raised by Mrs. Palazzolo.  (Damsker Dep. 44-45).  At approximately 5:00 p.m. that same evening, Dr. Damsker disseminated an email to all Department employees regarding the need for them accurately to sign-in and sign-out of work for time recordkeeping purposes.  (Damkser Dep 188, Dep Exh. 11).

Then, that same evening, Dr. Damsker sent an angry email to Mr. Hessenthaler defending himself against the theft of time issues in his Department reported by Mrs. Palazzolo.  (Damsker Dep. 191-192, Damsker Dep. Exh. 14).  In his August 9 email to Mr. Hessenthaler, Dr. Damsker stated that he is "upset about what transpired today."  (*Id.*)  Critically, Dr. Damsker stated that:

> I spoke with Joe today about two timesheet issues that obviously made it up to your office.  While Joe was not able to share how the situation came to light, it is fairly **obvious that Joanne Palazzolo** (possibly in conjunction with Barbara Althouse) **is responsible**.

(*Id.*) (Emphasis added).  Dr. Damsker then launched into a tirade of personal insults and name-calling against Mrs. Palazzolo and Ms. Althouse.  He accused Mrs. Palazzolo of being "a very miserable and vindictive person" whose "people skills stink." (*Id.*)  He accused Ms. Althouse of being "truly miserable and as immature as a 10 year-old." (*Id.*)  Dr. Damsker states with respect to Ms. Althouse, "I'm actually embarrassed that she is an employee of mine" and that his problems with her are "her loud obnoxious mouth, her poor personal hygiene, and the fact that she can be plain ole' [sic] mean at times."  (*Id.*)

Dr. Damsker's gratuitous insults of Mrs. Palazzolo and Ms. Althouse had nothing whatsoever to do with Mrs. Palazzolo's reports of theft of time in the Health Department, but do bespeak a highly emotional and outraged reaction to those reports. Dr. Damsker's virulent reaction to Mrs. Palazzolo reports was not well founded. To the contrary, Mrs. Palazzolo's reports were not only made in good faith, but they indisputably proved to be correct and it is undisputed that Mrs. Palazzolo was acting properly within the scope of her responsibilities as Business Manager of the Health Department to come forward with her reports. (Damsker Dep. 50-54; Funk Dep. 9-11, 13-20; Hessenthaler Dep. 20-26, 28). Dr. Damsker's mental state, that he himself understatedly characterizes as "upset" and is reflected by hostile personal attacks, is clearly consistent with the retaliatory actions he took against Mrs. Palazzolo in the days that followed.

The next day, August 10, 2010, Mrs. Palazzolo received a telephone call from Deputy County Controller, Kimberly Doran, just as Mr. Hessenthaler had predicted earlier. (Palazzolo Dep. 255-256). Ms. Doran requested that Mrs. Palazzolo meet with her the following day, August 11, 2010, at 2:00 p.m. at her office in Doylestown to discuss possible payroll abuses in the Health Department. (*Id.*) Mrs. Palazzolo responded that she would meet with Ms. Doran as requested. (*Id.*) Indeed, according to Bucks County Human Resources Policy #004.3; Mrs. Palazzolo was "Subject to Immediate Dismissal" if she failed to participate in the investigation. (Damsker Dep. 175-177, Damsker Dep. Exh. 8).

Dr. Damsker confirmed that on August 11, at approximately 1:00 p.m., he heard Mrs. Palazzolo preparing to leave the office. (Damsker Dep. 125-126, 145). In fact, according to Dr. Damsker, it seemed to him at the time that it was taking Mrs. Palazzolo "forever" to leave her office since he could hear her getting her books and other things together, and her keys jingling.

(*Id.*)  Dr. Damsker remembers thinking, as he heard Mrs. Palazzolo taking so long getting ready to leave the office, that "Oh, God, it's taking her forever to leave."  (*Id.* 126).  He also recalls actually seeing her leave the office "with a bunch of stuff."  (*Id.* 128).  Dr. Damsker's deposition admissions in this regard stand in stark contrast to his statement in an email he sent to the County Human Resources Director purporting to recount the events of August 11 that "On Wednesday, August 11th, sometime around 1pm, ***unbeknownst to me,*** Joanne left the building."  (Damsker Dep. 214, Damsker Dep. Exh. 21)  (Emphasis added).  Dr. Damsker heard Mrs. Palazzolo getting ready to leave the building and actually saw her leave.  (Damsker Dep.  125-126, 128, 145).  Her leaving was anything but "unbeknownst" to him.

Mrs. Palazzolo was never required to inform Dr. Damsker when she left the office and of where she was going.  (Palazzolo Dep. 82-83, 265-266).  The Defendants claim, however, that Mrs. Palazzolo was required to inform Dr. Damsker whenever she left the office and of where she was going.  (Damsker Dep. 202, Damsker Dep. Exh. 18; Dolan Dep. 31-32)  (Cited portions of the deposition transcript of Bucks County Human Resources Director, Meredith Dolan, are attached as Exhibit "E").  Despite the Defendants' claim that Mrs. Palazzolo was required to inform Dr. Damsker whenever she left the office and of where she was going, and despite the fact that Dr. Damsker admitted that he heard and saw Mrs. Palazzolo leave the office on August 11, Dr. Damsker said nothing to Mrs. Palazzolo when he saw her leaving the office.  (Damsker Dep. 128).  He never bothered to say, "Hey, Joanne, wait a minute, where are you going?" when he heard her getting ready to leave the office or saw her actually leave if he really had a concern or did not know where she was going.  Dr. Damsker acknowledged that he could have asked Mrs. Palazzolo where she was going when he saw her leaving the office but did not.  (*Id.* 145-146).  Dr. Damsker also confirmed that he had Mrs. Palazzolo's cell phone number, but did not

5

even think to call her on August 11 to ascertain her whereabouts after she left the office.  (*Id.* 225).

Before she left the office on the afternoon of August 11 for her meeting with Deputy Controller Doran, Mrs. Palazzolo signed-out on the office whiteboard indicating that she was going to the County "Courthouse."  (Palazzolo Dep. 263; Damsker Dep. 145).  When she arrived at the Courthouse, Mrs. Palazzolo first went to see Walt Johnson in the Finance Department to discuss the budget packages that had just issued, but Mr. Johnson was not in that day.  (Palazzolo Dep. 267-268).  Then, Mrs. Palazzolo encountered County employee, Fonta Reilly, and spoke with her for a few minutes.  (*Id.* 268).  Next, Mrs. Palazzolo stopped in to see Dave Boscola, the newly appointed Acting Director of Finance, to see how he was doing in his new role and spoke with him for a few minutes.  (*Id.*)

As Mrs. Palazzolo's 2:00 p.m. appointment with Deputy Controller Doran approached, Mrs. Palazzolo walked to the Controller's Office.  (*Id.* 270)  When she arrived for her 2:00 p.m. meeting with Ms. Doran, Ms. Doran was not in the office but arrived about a half hour late.  (Palazzolo Dep. 271).  When the meeting did commence, Mrs. Palazzolo and Ms. Doran were joined by County Investigator David Rouland.  (Palazzolo Dep. 270-271).  At the meeting, Mrs. Palazzolo, Ms. Doran and Mr. Rouland discussed, among other things, the theft of time issues in the Health Department that Mrs. Palazzolo had reported.  (*Id.* 272-298, 300-302).

At the conclusion of the meeting, Deputy Controller Doran instructed Mrs. Palazzolo not to divulge anything to anyone about their meeting or the investigation.  (Palazzolo Dep. 311; Hessenthaler Dep. 47).[1]  Bucks County Chief Operating Officer, Mr. Hessenthaler, confirmed

---

[1]   Sometime after Mrs. Palazzolo's employment with the County was terminated, Mr. Hessenthaler learned that Mrs. Palazzolo had indeed been instructed by Ms. Doran to keep the fact of her meeting with Ms. Doran confidential.  (Hessenthaler Dep. 47).

that it would indeed be appropriate for the Controller to direct a County employee to keep the facts and circumstances of an investigation or audit that the Controller was conducting confidential. (Hessenthaler Dep. 12-14). Indeed, it was a condition of an individual's employment with the County that he/she cooperate with the Controller's Office when it conducts an investigation or audit, and a condition of a County employee's employment to follow the directives of the Controller's Office in connection with an investigation or audit that the Controller's Office was conducting. (*Id.*) Likewise, Bucks County's Director of Human Resources, Meredith Dolan, who is in charge of Human Resources for the County and has been employed by the County in Human Resources for approximately 18 years, confirmed that if the Controller's Office in the course of conducting an investigation instructs an employee that the investigation in which the employee is participating with the Controller's Office is to be kept confidential, the employee is expected to comply with that directive. (Dolan Dep. 5, 29-30).

Thus, consistent with the testimony of Chief Operating Officer Hessenthaler and Human Resources Director Dolan, Mrs. Palazzolo was expected comply with the directive of the Controller's Office that she not divulge anything to anyone about her meeting with Ms. Doran and Mr. Rouland of August 11. Indeed, as noted above, according to Bucks County Human Resources Policy #004.3, Mrs. Palazzolo was "Subject to Immediate Dismissal" if she failed to participate in the investigation. (Damsker Dep. 175-177, Damsker Dep. Exh. 8, Class I, ¶ 20). Moreover, according to that same County Policy, Mrs. Palazzolo was "Subject to Immediate Dismissal" if she divulged her meeting with Ms. Doran or the fact of the investigation to *anyone* since she and other Bucks County employees were "Subject to Immediate Dismissal" for the "Disclosure of any and all confidential information to unauthorized persons." (Damsker Dep. 175, Damsker Dep. Exh. 8, Class I, ¶ 18).

Meanwhile, back in the Health Department, as of **August 9**, Dr. Damsker acknowledged to Mr. Hessenthaler that it was "**obvious**" to Dr. Damsker that Mrs. Palazzolo was responsible for reporting the timesheet issues and that she was responsible for the information "**making it up to the courthouse**." (Damsker Dep. 59, 191-192, Damsker Dep. Exh. 14).  Thus, when Dr. Damsker heard Mrs. Palazzolo taking "forever" to collect things when she was leaving the office on the afternoon of August 11, actually saw her leave the office "with a bunch of stuff," and saw that she had signed-out on the whiteboard that she was going to the Courthouse, it is certainly inferable by a jury, if not crystal clear, that Dr. Damsker knew where she was going and why.  If he really did not know, he would have asked her where she was going and why when he saw her leaving the office, especially in view of the Defendants' contention that Mrs. Palazzolo was required to inform Dr. Damsker whenever she left the office and of where she was going. (Dolan Dep. 31-32).  If he really did not know where Mrs. Palazzolo was, he could have called her on her cell phone.  Dr. Damsker did neither of those things because he knew that Mrs. Palazzolo was responsible for the theft of time "information making it to the Courthouse" in the first place, and that her being out of the office at the Courthouse as reflected on the whiteboard after having taken "forever" to collect various books and other materials to take with her, was in connection with her report of the theft of time information.

Dr. Damsker, however, proffers an incredulous account of how he learned that Mrs. Palazzolo was out of the office at the Courthouse on August 11.  According to Dr. Damsker, another employee in the office told him that when Mrs. Palazzolo was leaving the office to meet with Deputy Controller Doran on August 11, three other employees happened to be sitting in the lunchroom as Mrs. Palazzolo passed, although Dr. Damsker has no first hand knowledge of this. (Damsker Dep. 128-129).  According to Dr. Damsker and his hearsay, the three employees in the

lunchroom – Barbara Schellhorn, Marlene Emsley and Beth Zack -- heard the "clip-clop" of Mrs. Palazzolo's shoes and Schellhorn, out of the blue, made the comment that "Oh, someone should see where she's going with all this stuff or whatever . . .." (Damsker Dep. 128-129). Notably, Dr. Damsker's proffered hearsay intelligence based on the sound of the "clip-clop" of Mrs. Palazzolo's shoes does not include any visual observation by Ms. Schellhorn or anyone else of Mrs. Palazzolo carrying "all this stuff or whatever." (*Id.*) Moreover, neither Schellhorn, Emsley nor Zack was ever Mrs. Palazzolo's supervisor, and would have had no reason for tracking Mrs. Palazzolo unless Dr. Damsker instructed one or more of them to do so. Indeed, unless Dr. Damsker informed them of it, none of them would have had any way of knowing whether Dr. Damsker already knew where Mrs. Palazzolo was going when she left the office that afternoon such that "someone should see where she's going with all this stuff or whatever . . .."

Then, according to Dr. Damsker, he found-out about Mrs. Palazzolo's whereabouts in the following third-hand and decidedly incredulous manner:

> After they had -- after they ate lunch ***we got*** -- Marlene had gotten a call from, I don't know who at the courthouse, but her job -- we have -- the Grange Fair was coming up, which is the big fair up at the 4H fair. And every county department has a table that you put -- that you sit, so when people come, you can say, this is what the Health Department does, you know, like a demo table kind of thing. And she was called by the courthouse to go up to get those Grange Fair tickets, for our staff to get passes to the fair to go set up and that kind of thing. Well, she was up there, after being a part of that conversation. And she said that she was talking to someone, and she had gotten the tickets. And I guess she saw -- I guess she heard the distinctive sounds of Joanne's feet with the shoes. And she turned and she said, that looks like Joanne. And this was, I guess this was right before 2:00. And she saw her leaving the courthouse. Now, she called Barbara Schellhorn to – as like almost a funny thing to say, hey, guess who I just saw leaving, you know, I heard the footsteps. It was like a funny thing, that -- you know, that they saw her leaving. And then Beth -- that conversation, I think I was -- I forget where I was. I was talking to Debbie Mumbauer or something, and Beth had heard the conversation and filled me in about that. And at some point, I had gone over to the board at this point, and they said she was in the courthouse. And somewhere between 2:00 and her return at 4:00 is when I saw that she had put "CH" on the sign-out board. I never looked at the sign-out board on a normal

basis, because number one, I don't believe she was using it on a regular basis. I knew she wasn't signing in and out on a regular basis. And what do you call it, let's see. So the part that was interesting, that, you know, they heard her footsteps, which was almost funny. So that was the end of that. An hour later, you think, okay, someone saw Joanne leaving the courthouse at ten of 2:00. So you figure, she walks to her car, she drives back, and she should be back, 2:15, 2:30. So 2:30 goes by, three o'clock goes by. I keep doing my work. I remember someone saw her leaving the courthouse at -- before two o'clock. Then 2:30, three o'clock goes by, 3:30 goes by. Finally, at 4:09, I think it was, she walks back in the office. So I knew right away, some flags were -- and I would hope that any supervisor would have these flags in their head, that someone was seen -- whether she wrote "CH" or not, she was seen leaving somewhere she said she was, two hours prior to coming back to the department. That's a red flag, I think, for anyone to hear. So when she came back to the office, again, it was about 4:09.

(Damsker Dep. 129-133) (Emphasis added). Dr. Damsker's foregoing account of how he learned that Mrs. Palazzolo was at the County Courthouse bespeaks a disingenuous set-up. Indeed, at the outset of his description, he testified that "we got," but then changed it to "Marlene got," a call from some unknown person at the Courthouse. Then, according to Dr. Damsker he had heard from another employee Beth Zack, that when Marlene was at the Courthouse, she called Barbara Schellhorn solely to report that she heard the clip-clop of Mrs. Palazzolo's shoes and saw her leaving the Courthouse at 2:00 p.m. even though neither Marlene nor Ms. Schellhorn was Mrs. Palazzolo's supervisor or otherwise responsible for tracking her whereabouts and even though there was absolutely nothing out of the ordinary for Mrs. Palazzolo to be at the Courthouse on County business. (Damsker Dep. 129-148; Palazzolo Dep. 333). Dr. Damsker's reliance on office gossip and triple hearsay to justify his inquest into Mrs. Palazzolo's whereabouts on August 11 is disingenuous and a jury could infer that it is part of pretextual cover-up of his retaliatory actions toward Ms. Palazzolo under the totality of the circumstances.

After her meeting with Deputy Controller Doran and Investigator Rouland, Mrs. Palazzolo returned to her office at the Health Department where Dr. Damsker awaited her and interrogated her about her whereabouts that afternoon. (Palazzolo Dep. 317-318). But, Mrs. Palazzolo was constrained to comply with Deputy Controller Doran's instruction that she not divulge anything about their earlier meeting or the investigation to anyone. (Hessenthaler Dep. 12-14; Dolan Dep. 29-30; Damsker Dep. 175-177, Damsker Dep. Exh. 8, Class I, ¶ 18). Mrs. Palazzolo was never known to be anything but trustworthy throughout her employment with Bucks County. (Hessenthaler Dep. 48-49; Funk Dep. 48-49; Dolan Dep. 61-62). In fact, up to this point in time, Dr. Damsker **_never_** once before asked Mrs. Palazzolo about her comings or goings. (Palazzolo 324, 330).

Faced with the choice of having to divulge her meeting with the Controller's Office and subjecting herself to immediate dismissal for doing so under County Policy, or of not divulging the meeting without lying to her boss, Mrs. Palazzolo told Dr. Damsker that she "went to the courthouse to see Walt Johnson" to discuss the budget. (*Id.* 318-319). Indeed, Mrs. Palazzolo had in fact stopped to see Mr. Johnson at the Courthouse that afternoon to discuss the budget. (Palazzolo Dep. 267-268).

Dr. Damsker, however, did not accept Mrs. Palazzolo's response and contacted his boss, Joseph Funk, about the situation. (Damsker Dep. 223, Damsker Dep. Exh. 23). According to Dr. Damsker, Mrs. Palazzolo returned to the office at 4:09 p.m. on August 11. (Damsker Dep. 132). Prior to her return, Dr. Damsker had already been in contact with Mr. Funk by around 3:00 or 3:30 that afternoon because Dr. Damsker was suspicious about Mrs. Palazzolo's

whereabouts.  (*Id.* 224-225).[2]  After Mrs. Palazzolo returned to the office at 4:09 p.m. and told

Dr. Damsker that she had been to see Walt Johnson at the Courthouse, Dr. Damsker

instantaneously emailed Mr. Funk at 4:12 p.m. with the message, "She just came back and said

she was with Walt all afternoon doing budget stuff.  Is that true?"  (*Id.* 223, Damsker Dep. Exh.

23).  This was all occurring despite the fact that up to that point in time, Dr. Damsker ***never*** once

before asked Mrs. Palazzolo about her comings or goings.  (Palazzolo 324, 330).

As if to say, "We got her!!!" Mr. Funk excitedly replied to Dr. Damsker at 8:57 a.m. the

following morning, August 12, "The answer to your question is absolutely NO!!!!!  Walt was not

in yesterday at all!!!!!  **You now need to go to Meredith and present all the facts and indicate**

**that there is no way she can continue to work in your Department and should be**

**discharged from employment.**  She lied to you and again is subverting your authority as the

Health Department Director."  (Damsker Dep. Exh. 23) (Bold emphasis added).  Mr. Funk's leap

to judgment that Mrs. Palazzolo should be discharged was made without first communicating

with Mrs. Palazzolo in any way to obtain her side of the story despite the fact that throughout

Mrs. Palazzolo's employment with the County, Mr. Funk testified that he respected Mrs.

Palazzolo and regarded her as trustworthy.  (Funk Dep. 48-50).  Indeed, Mr. Funk confirmed that

it was only ***after*** Mrs. Palazzolo was discharged that he did anything to "get really what the facts

were."  (*Id.* 25).

The next day, August 12, Dr. Damsker continued to interrogate Mrs. Palazzolo about

her whereabouts the previous afternoon.  That afternoon, Dr. Damsker stated to Mrs. Palazzolo

---

[2]     Again, up to that point, Dr. Damsker had ***never*** once questioned Mrs. Palazzolo's comings
or goings.  (Palazzolo 324, 330).  Thus, Dr. Damsker's admitted suspicions about Mrs.
Palazzolo's whereabouts on this one and only occasion when he questioned them are clearly
a direct result of the theft of time information for which, it was obvious to Dr. Damsker,
Mrs. Palazzolo was responsible for "making it to the Courthouse."

that Walt Johnson was not in "work status" the previous day. (Palazzolo Dep. 320). Mrs. Palazzolo responded that Dr. Damsker was correct, but that she did not know that Mr. Johnson was not in work the previous day until she got to his office. (*Id.*) Mrs. Palazzolo – still under the County-imposed obligation to comply with the Controller's Office directive not to divulge anything to anyone about their meeting of the previous day – told Dr. Damsker that she saw Fonta Reilly and Dave Buscola. (*Id.*) Indeed, Mrs. Palazzolo had seen Ms. Reilly and Mr. Buscola at the Courthouse when she was there on August 11. (*Id.* 268). Later that afternoon, Dr. Damsker again approached Mrs. Palazzolo and told her "that there is information out there that you were not in the Finance Department all afternoon." (*Id.* 322). Mrs. Palazzolo asked him who was the source of that information, but Dr. Damsker did not disclose his source. (*Id.*) Mrs. Palazzolo then told Dr. Damsker that she would have the person with whom she met on August 11 contact him directly, and assured him that she was on County business when she met with that person. (*Id.* 322-323).

Mrs. Palazzolo was very upset and unnerved by Dr. Damsker's persistent inquisition where she was directed by Deputy Controller Doran not to disclose their meeting to anyone and where Dr. Damsker had ***never*** shown any interest in her comings or goings before. (*Id.* 330-331). In fact, Mrs. Palazzolo was so distracted by Dr. Damsker's harassing persistence that she had an automobile accident on her way home that day, August 12. (*Id.*)

The next morning, August 13, Dr. Damsker received an email from Deputy Controller Doran at 11:22 a.m. stating, "Hi Dave, I understand that you were asking Joanne about her meeting in Doylestown on Wednesday. She was here with me until approx. 3:30. Thank you, Kim." (Damsker Dep. 202, Damsker Dep. Exh. 18, bates page 03160). Ms. Doran called Mrs.

Palazzolo at her home that same day and left the following message on Ms. Palazzolo's

answering machine:

> Hey, Joanne, it's Kim from the Controller's Office.  I wanted to let you know that I sent Doctor Damsker an email saying that you were with me on Wednesday afternoon.  Thank you, and that was it.  I didn't go any further than that.  I didn't tell him what we discussed and will not tell him what we discussed, but he does know that you were with me until approximately 3:30 on Wednesday.  The other question I had for you, is there any chance that we can pick up that box from you today or, you know, come by your way and get it.  If you can give me a call, I would appreciate it. Thank you.

(Palazzolo Dep. 5-6, 229-231; Doran Dep. 25, 45-47) (Cited portions of Kimberly Doran's

deposition transcript are attached as Exhibit "F.")  Ms. Doran's voicemail message is consistent

with Mrs. Palazzolo's testimony that Ms. Doran instructed her not to divulge anything about

their meeting to anyone.  Ms. Doran emphasized in her message that was extremely resistant to

disclosing anything to Dr. Damsker about her meeting with Mrs. Palazzolo.   It is also clear that

Ms. Doran wanted to inform Mrs. Palazzolo that Dr. Damsker now knew that Mrs. Palazzolo

was with her that Wednesday afternoon, so Mrs. Palazzolo could breathe easy about her prior

obligation not to disclose that information.  Indeed, in Ms. Doran's email to Dr. Damsker she

states, "I understand that you were asking Joanne about her meeting in Doylestown on

Wednesday."  At no time did Ms. Doran suggest to Mrs. Palazzolo or Dr. Damsker that Mrs.

Palazzolo could have or should have divulged to Dr. Damsker that she had been with Ms. Doran

that afternoon.  Nowhere does Ms. Doran even question why it would be necessary for her to

inform Dr. Damsker of Mrs. Palazzolo's whereabouts instead of Mrs. Palazzolo disclosing that

herself.  That is because Ms. Doran knew that she instructed Mrs. Palazzolo not to divulge

anything about the meeting to anyone, including Dr. Damsker.  Instead, Ms. Doran emphasized

in her voice mail message that while she informed Dr. Damsker that Mrs. Palazzolo was with her

that Wednesday afternoon, she did not and would not disclose to Dr. Damsker anything else

about the meeting.  Indeed, Ms. Doran confirmed that her Office never tells other people what people have brought to it.  (Doran Dep. 46).

Dr. Damsker forwarded Deputy Controller Doran's August 13 email to Human Resources Director, Meredith Dolan, and to his boss, Mr. Funk.  (*Id.*)  Neither Ms. Dolan, Mr. Funk, Dr. Damsker nor anyone else ever contacted the Controller's Office in connection with Deputy Controller Doran's email confirming that Mrs. Palazzolo was with her on the afternoon of August 11.  (Doran Dep. 34-35).  In fact, when the Controller's Office called and emailed Ms. Dolan in Human Resources in connection with Mrs. Palazzolo's whereabouts on August 11, Ms. Dolan simply ignored those contacts and never replied or called the Controller's Office back. (McHugh Dep. 15, 19; Dolan Dep. 51) (Cited portions of Bucks County Controller, Raymond McHugh's, deposition transcript are attached as Exhibit "G.").  In fact, when Dr. Damsker asked Ms. Dolan whether he should reply to Deputy Controller Doran, Ms. Dolan instructed him that he should not reply to her, apparently recognizing that if Ms. Dolan and Dr. Damsker had the actual facts, their retaliatory goal of firing Mrs. Palazzolo could have been thwarted.  (Damsker Dep. 203).

On August 13, 2010, Mrs. Palazzolo emailed Dr. Damsker to inform him that she was in a car accident the previous evening and that she was going to her physician so she would not be in work that day.  (Damsker Dep. 198, Damsker Dep. Exh. 17).  Dr. Damsker replied that Mrs. Palazzolo was required to bring in a doctor's note or medical release when she returned to work. (*Id.*)  Under County policy, employees are not required to submit a doctor's note in connection with an absence unless the absence is for three or more days.  (Palazzolo 339).  So, Mrs. Palazzolo called Dr. Damsker to ask why she was being treated in a manner that was not

consistent with County policies. (*Id.* 339-340). Dr. Damsker was surprised by Mrs. Palazzolo's inquiry and fumbled for a response. (*Id.*; Damsker Dep. Exh. 19)

The decision was made to discharge Mrs. Palazzolo in the mid to late afternoon on August 13, 2010, for allegedly lying to Dr. Damsker about her whereabouts when she met with Deputy Controller Doran about theft of time in the Health Department. (Damsker Dep. 124, 210). Thus, Dr. Damsker and Ms. Dolan exchanged emails on the evening of August 13 about the logistics of the termination. (Damsker Dep. Exh. 19).

Due to the car accident she sustained on August 12, Mrs. Palazzolo was not able to return to work until August 18. (Palazzolo 315, 342-343). Meanwhile, Mrs. Palazzolo sent emails on August 14 and 16 to Director of Human Resources, Ms. Dolan, and Mr. Hessenthaler seeking protection as a Whistleblower. (Palazzolo Dep. 338, 341). This was in accordance with Bucks County Human Resources' Policy #034.0 addressing "Whistle Blower Protection." (Palazzolo Dep. Exh. 14).

No one ever replied to those emails. (*Id.* 341). In fact, neither Ms. Dolan, Dr. Damsker, Mr. Funk, Mr. Hessenthaler nor anyone else with the County ever contacted Ms. Palazzolo or Deputy Controller Doran about their meeting on August 11 or to ascertain what instructions were given to Mrs. Palazzolo about maintaining confidentiality of that meeting. (Doran Dep. 34-35; McHugh Dep. 15, 19; Dolan Dep. 51; Funk Dep. 40; Hessenthaler Dep. 45-47). As the County Chief Operating Officer, Mr. Hessenthaler testified that it is a core principle of the County's management approach that there are at least two sides to every story. (Hessenthaler Dep. 36, 45-47). As Director of Health and Human Services and as 30-year employee of the County, Mr. Funk, testified that when he conducts investigations, he does not simply take one person's word that something improper occurred, but investigates the relevant facts, documents and

circumstances.  (Funk Dep. 4-10).  As the head of Human Resources for the County, Director of Human Resources, Ms. Dolan, testified that conducting investigations was one of her functions.  (Dolan Dep. 9).  She confirmed that one component of an investigation she would do in connection with an allegation of employee misconduct would be to conduct interviews, and those could include interviews of the employee accused of the misconduct.  (Dolan Dep. 39-40; Damsker Dep. 95).  But, no one ever contacted Mrs. Palazzolo to hear her side of the story before the decision was made to fire her in violation of the "core principle of the County's management approach" and common sense, and no one bothered to contact Deputy Controller Doran to obtain her input on the circumstances despite the fact that Ms. Doran reached-out to Human Resources Director Dolan and Dr. Damsker,.  (Doran Dep. 34-35; McHugh Dep. 15, 19; Dolan Dep. 51; Funk Dep. 40; Hessenthaler Dep. 45-47).

Mrs. Palazzolo was informed by Director of Human Resources, Ms. Dolan, that she was fired on August 18.  (Palazzolo Dep. 344-345).  According to Ms. Dolan, the only reason for Mrs. Palazzolo's termination is that she lied to her boss, Dr. Damsker – no other reason.  (Dolan Dep. 30-31; Palazzolo Dep. 344-345).  Despite the fact that Ms. Dolan told Mrs. Palazzolo that the ***only*** reason she was being fired on August 18 was that she lied to her boss, and despite the fact that Ms. Dolan testified in her deposition that the only reason for the termination was that Mrs. Palazzolo lied to her boss, the termination letter that Ms. Dolan gave to Mrs. Palazzolo is at odds with her previous statement and deposition testimony.  Specifically, in the termination letter of August 20, 2010, Ms. Dolan stated:

> This is to follow up on the meeting we had Wednesday, August 18, 2010.  As we discussed in our meeting of January 2010, you were told that you were accountable for your time and to be sure Dr. Damsker knew your whereabouts, especially if you were leaving the department. . . .

> As I stated in our meeting, effective immediately your employment with the County is terminated.  Joanne, dishonesty can not [sic] be tolerated.  You knew that Dr. Damsker should have been told you were leaving the building, especially for over three hours.  You did not tell him and when asked where you had been, in fact lied to him.  He gave you several opportunities to correct the issue and you continued to lie.

(Palazzolo Dep. Exh. 35) (Emphasis in original).[3]

Contrary to Ms. Dolan's statement, Mrs. Palazzolo was ***never*** told that she had to tell Dr. Damsker when she was leaving the building.  (Palazzolo Dep. 82-83, 265-266).  Indeed, until August 11 when Mrs. Palazzolo returned from her meeting with Deputy Controller Doran, Dr. Damsker ***never*** once before asked Mrs. Palazzolo about her comings or goings.  (Palazzolo 324, 330).  Moreover, Dr. Damsker admitted that he knew full well that Mrs. Palazzolo was leaving the building before she left, and that he actually saw her leave for her meeting on August 11. (Damsker Dep.  125-126, 128, 145).  In an email he sent to Ms. Dolan purporting to recount the events of August 11, Dr. Damsker claimed that "On Wednesday, August 11th, sometime around 1pm, ***unbeknownst to me,*** Joanne left the building."  (Damsker Dep. 214, Damsker Dep. Exh. 21)  (Emphasis added).  That was objectively false. In fact, not only did Dr. Damsker know that Mrs. Palazzolo was leaving the building, but he did not ask her where she was going nor did he even think to call her to find-out where she was, and he acknowledged that she signed-out on the whiteboard that she had gone to the Courthouse. (Palazzolo Dep. 263; Damsker Dep. 128,145-146, 225)

---

[3]   It bears noting that there is no reference in the termination letter to Mrs. Palazzolo's use of profanity or shouting at her supervisor in the incident highlighted in Defendants' summary judgment brief that occurred in January 2010.  It is undisputable that the ***only*** reason alleged by the Defendants for Mrs. Palazzolo's termination is the alleged lie about her whereabouts on August 11.  The Defendants attempt to deflect attention to the January 2010 incident because the actual asserted reason for terminating Mrs. Palazzolo – lying to her supervisor -- is so untenable.

Ms. Dolan viewed as "especially" important the fact that Mrs. Palazzolo left the building allegedly without Dr. Damsker's knowledge in explaining the reasons for termination in the letter she sent Mrs. Palazzolo.  (Palazzolo Dep. Exh. 35).  That reason, however, is objectively false.

After Mrs. Palazzolo was fired at the age of 54, she was replaced in the position of Business Manager of the Health Department by an individual who was about 37 or 38 years old at the time he replaced Mrs. Palazzolo.  (Answer to Second Amended Complaint ¶ 56).

II.   **ARGUMENT**

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THE EVIDENCE OF RECORD, VIEWED IN A LIGHT MOST FAVORABLE TO PLAINTIFF, ESTABLISHES THAT PLAINTIFF WAS DISCHARGED FROM HER EMPLOYMENT IN VIOLATION OF THE PENNSYLVANIA WHISTLEBLOWER ACT AND/OR THE AGE DISCRIMINATION IN EMPLOYMENT ACT.**

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 535 (3d Cir. 2007); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is not appropriate if after examining the evidence of record, the Court determines that there is a genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

A.   **Plaintiff Has Adduced Evidence Sufficient To Support Her Claim In Count I Of The Second Amended Complaint That She Was Discharged From Her Employment With Bucks County In Violation Of The Pennsylvania Whistleblower Act.**

In Count I of her Second Amended Complaint, Mrs. Palazzolo avers that Defendants violated the Pennsylvania Whistleblower Law, 43 P.S. § 1421, *et seq.* by terminating her employment in retaliation for reporting and opposing wrongdoing or waste.  Defendants assume, for the purpose of their summary judgment motion, that Mrs. Palazzolo made a good faith report or wrongdoing or waste when she met with Deputy Controller Doran on August 11.  In so doing, Defendants focus solely on Mrs. Palazzolo's meeting with Ms. Doran on August 11.  Mrs. Palazzolo testified, however, that in addition to in her meeting with the Deputy Controller, she also reported wrongdoing or waste to Mr. Hessenthaler that led to the Controller's investigation

and that Dr. Damsker retaliated against her for doing so by firing her.  (Palazzolo Dep. 524-525).

Defendants argue, however, that although Mrs. Palazzolo may have made good faith reports of

wrongdoing of waste, summary judgment is appropriate because there is no evidence of a causal

connection between her reports of wrongdoing or waste and her termination.  Defendants are

wrong.

Third Circuit case law in the context of federal anti-discrimination claims suggests

several factors that a district court can look to in making this determination, including (1) the

temporal proximity between the employee's protected activity and the adverse employment

action, and (2) discrepancies in the proffered reasons for the adverse employment action.

*Abramson v. William Patterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001).  A close

temporal connection is evidence of a causal nexus between the protected activity and the adverse

employment action, even if it is not conclusive on its own.  *Willauer v. Riley Sales, Inc.*, No. 08-

5258 (E.D.Pa. Sept. 16, 2009).

Here, the timing of Mrs. Palazzolo's termination is extremely suggestive of retaliation.

She transmitted her report of theft of time in the Health Department to Mr. Hessenthaler on

August 8.  (*Id.* 297, 422-432, 524-525, Palazzolo Dep. Exh. 15).  Mr. Hessenthaler then

discussed the time theft issues raised by Mrs. Palazzolo with Joseph Funk, Dr. Damsker's

immediate supervisor.  (Hessenthaler Dep. 18-19).  The following morning, Monday, August 9,

2010, Mrs. Palazzolo received a call from Mr. Funk in which Mr. Funk asked her why she had

gone to Mr. Hessenthaler and stated that now, he would have to come to the Health Department

office and deal with the matter.  (*Id.* 325-326).  After the telephone call between Mrs. Palazzolo

and Mr. Funk on August 9, Mr. Funk visited the Health Department offices that day and met

with Dr. Damsker in connection with theft of time issues raised by Mrs. Palazzolo.  (Damsker

Dep. 44-45).  At approximately 5:00 p.m. that same evening, Dr. Damsker disseminated an email

to all Department employees regarding the need for them accurately to sign-in and sign-out of

work for time recordkeeping purposes.  (Damkser Dep 188, Dep Exh. 11).

Then, that same evening, Dr. Damsker sent an angry email to Mr. Hessenthaler defending

himself against the theft of time issues in his Department reported by Mrs. Palazzolo and

specifically acknowledging that it was "**obvious**" to him that it was Mrs. Palazzolo that was

responsible for the report "making it to the Courthouse."   (Damsker Dep. 59, 191-192, Damsker

Dep. Exh. 14).  Dr. Damsker stated in the email that he was upset and launched into an *ad

hominem* attack on Mrs. Palazzolo.  (*Id.*)

Just two days later, on August 11, when Mrs. Palazzolo was summoned to the

Controller's Office in connection with her theft-of-time reports, Dr. Damsker admitted in his

deposition testimony that he was fully aware that Mrs. Palazzolo was getting ready to leave the

office because he heard her taking "forever" to collect various materials before she left.  He also

admitted that he saw actually saw her leave, but never asked her where she was going and never

thought to call her to find-out either.  He acknowledged that she signed-out on the whiteboard

that she was going to the Courthouse before she left – the Courthouse to which Dr. Damsker

knew that Mrs. Palazzolo's reports of time theft had made it.  Dr. Damsker nevertheless informed

Human Resources Director Ms. Dolan that Mrs. Palazzolo left the office "unbeknownst" to him.

Then, although he never ever before questioned Mrs. Palazzolo's whereabouts, he

launched an inquest on her whereabouts that involved Mr. Funk, office gossip, and finally the

interrogation of Mrs. Palazzolo herself.

On August 12, Mr. Funk instructed Dr. Damsker that Mrs. Palazzolo must be discharged.

The very next day, on August 13, the "official" decision was made to fire Mrs. Palazzolo without

anyone even asking her anything about what happened and with Dr. Damsker and Human Resources Director, Ms. Dolan, purposefully avoiding Deputy Controller Doran, even though they had been informed by Ms. Doran earlier that very day that Mrs. Palazzolo was with her on August 11.

So, a mere 4 days elapsed from the time Mrs. Palazzolo reported the theft of time issues to Mr. Hessenthaler on August 8 to the date that Mr. Funk ordered her discharge on August 12. A mere 5 days elapsed from Mrs. Palazzolo's August 8 reports of theft of time until the decision was "officially" made to fire her without so much as asking her why she told Dr. Damsker she went to see Walt Johnson, and then Fonta Riley and David Buscola.  Had someone asked her that question on August 13 *after* Deputy Controller Doran divulged to Dr. Damsker that Mrs. Palazzolo was with her in the afternoon of August 11, Mrs. Palazzolo could have explained that she was instructed not to divulge anything about her meeting with Ms. Doran – an instruction with which, Mr. Hessenthaler, Ms. Dolan and the County Human Resources Policies all confirmed, Mrs. Palazzolo was required to comply as a condition of her employment.

Under the factual circumstances of this case, the timing of the decision to discharge Mrs. Palazzolo is highly suggestive of retaliation.

In fact, in accord with *Abramson*, there are numerous discrepancies in the Defendants' position with respect to Mrs. Palazzolo's discharge.  For example, Ms. Dolan and Mr. Hessenthaler confirmed that it would indeed be appropriate for the Controller to direct a County employee to keep the facts and circumstances of an investigation or audit that the Controller was conducting confidential and that it was a condition of an individual's employment with the County that he/she cooperate with the Controller's Office when it conducts an investigation or audit, and a condition of a County employee's employment to follow the directives of the

Controller's Office in connection with an investigation or audit that the Controller's Office was conducting.  (Hessenthaler Dep. 12-14; Dolan Dep. 5, 29-30).  There is a glaring discrepancy between this testimony and the fact that neither Ms. Dolan nor anyone else contacted Deputy Controller Doran before the decision to fire Mrs. Palazzolo was made after Ms. Doran confirmed that Mrs. Palazzolo was with her in the afternoon of August 11.

There is another glaring discrepancy between the testimony of Messrs. Hessenthaler and Funk, Dr. Damsker and Ms. Dolan that the County's management approach includes conducting investigations into allegations of employee misconduct with the recognition that there are at least two sides to every story.  Here, no one bothered to ask Mrs. Palazzolo for her side of the story.  Instead, the die was cast as early as August 12 when Mr. Funk instructed Dr. Damsker to fire Mrs. Palazzolo.

Discrepancies in the Defendants' proffered reasons for Mrs. Palazzolo's discharge also demonstrate the retaliatory motive underlying her discharge.  In her deposition testimony, Human Resources Director, Ms. Dolan, declared that the *only* reason Mrs. Palazzolo was fired was that she lied to her boss, Dr. Damsker, and that it did not matter that Dr. Damsker knew she was leaving the building.  (Dolan Dep. 30, 37-38).  But in the termination letter she sent to Mrs. Palazzolo, she emphasized that " . . . you were told that you were accountable for time and to be sure Dr. Damsker knew your whereabouts, <u>especially</u> if you were leaving the department. . . . You knew that Dr. Damsker should have been told you were leaving the building, especially for over three hours."  (Palazzolo Dep. Exh. 35).  Ms. Dolan contradicts herself in the termination letter by claiming that Mrs. Palazzolo did not let Dr. Damsker know that she was leaving the building on the one hand, while acknowledging on the other hand that Mrs. Palazzolo did sign-

out on the whiteboard which Dr. Damsker admitted reflected that Mrs. Palazzolo had gone to the Courthouse.

The inconsistency between the reasons for termination as set forth in the termination letter and her deposition testimony are explainable by the intervening deposition of Dr. Damsker in which he admitted -- contrary to his earlier email to Ms. Dolan where he stated that Mrs. Palazzolo left the building "unbeknownst" to him on August 11 – that he knew full well that Mrs. Palazzolo was preparing to leave the office that afternoon, that he actually heard Mrs. Palazzolo making a commotion as she prepared to leave that afternoon, that he actually saw her leave that afternoon without asking her where she was going.  The protean quality of the Defendants' version of the facts, however, is consistent with an attempted concealment of their true retaliatory motives

Of course, contrary to Ms. Dolan's statements that Mrs. Palazzolo was required to tell Dr. Damsker whenever she was leaving the building, Mrs. Palazzolo confirmed that she was ***never*** told that she had to let Dr. Damsker know whenever she was leaving the building and confirmed that prior to August 11, Dr. Damsker ***never*** before questioned her comings or goings.  Mrs. Palazzolo's testimony must be viewed in the most favorable light for the purpose of the Court's instant analysis.

In the Defendants' Answers to Interrogatories, there is another inconsistent version of the alleged reasons for firing Mrs. Palazzolo proffered by the Defendants.  In the answer to interrogatory no. 1, the Defendants claim that eight months prior to her discharge in January 2010, Mrs. Palazzolo was given a final warning that any further misconduct would result in discharge.  (Damsker Dep. Exh. 3).  Ms. Dolan's notes of the January meeting at which Mrs. Palazzolo's prior misconduct was addressed do not include any reference whatsoever to any final

warning.  (Damsker Dep. Exh. 1; Dolan Dep. 34-36).  To the contrary, Ms. Dolan confirmed that

no discipline was imposed on Mrs. Palazzolo in January 2010 other than possibly a one-day

suspension, and she was not even sure that a one-day suspension was imposed but deferred to Dr.

Damsker's recollection.  (Dolan Dep. 34-36).  Dr. Damsker confirmed that no such discipline

was imposed at all.  (Damsker Dep. 92-93).

More inconsistencies in the Defendants' position with respect to the termination of Mrs.

Palazzolo's employment are found in their interrogatory answers as compared with the

deposition testimony and documentary evidence from their own witnesses.  In interrogatory no.

2, the Defendants were asked: "With respect to each individual who had any role in the decision

to terminate Plaintiff's employment with Bucks County, who are those individuals, what is each

of their positions in the County, and what are the details of the role each such individual had in

the employment termination decision?"  (Damsker Dep. Exh. 3).  The Defendants answered as

follows:

> Doctor David Damsker, Director of the Health Department made the decision to
> discharge Plaintiff's employment.  Joseph Funk, Administrator and Division
> leader for the Division of Health and Human Services, agreed with the decision
> and gave his approval for the discharge.  Meredith Dolan, Director of Human
> Resources, reviewed the decision to ensure that it complied with County policies
> and was consistent with County practices, and agreed with the decision.

(Damsker Dep. Exh. 3).

Contrary to the Defendants' answer to interrogatory no. 2, Dr. Damsker testified that he

did not have the authority to fire Mrs. Palazzolo.  (Damkser Dep. 87-88).  Dr. Damsker testified

that only the County Commissioners could discharge an employee like Mrs. Palazzolo.  (*Id.*)

Inexplicably, none of the Commissioners are identified in the answer to interrogatory no. 2 as

having had any role in the decision to fire Mrs. Palazzolo.  To the contrary, Dr. Damsker testified

that the only Commissioner with whom he ever spoke about Mrs. Palazzolo's termination was

Commissioner Martin.  (Damsker Dep. 90-91)  But even that encounter was *after* Mrs. Palazzolo was already fired.  (*Id.*)  Commissioner Martin did not say a word in the course of that encounter. (*Id.*)

After he testified that only the Commissioners had the authority to discharge Mrs. Palazzolo, Dr. Damsker changed his testimony stating that the Director of Human Resources has authority to fire employees on behalf of the Commissioners in their absence.  (*Id.* 88).  But, that testimony is also not consistent with the answer to interrogatory no. 2 in which the Defendants state that Dr. Damsker, and not Ms. Dolan, made the decision to discharge Mrs. Palazzolo.

Also inconsistent with the Defendants' answer to interrogatory no. 2 is the documentary evidence establishing that Mr. Funk, Dr. Damsker's boss, explicitly instructed Dr. Damsker to discharge Mrs. Palazzolo on August 12.  Mr. Funk, annoyed with having to deal with the theft of time issue as expressed to Mrs. Palazzolo in his call to her on August 9, directed Dr. Damsker in an email on August 12 to discharge Mrs. Palazzolo.  (Damsker Dep. Exh. 23).

Plaintiff respectfully submits that there is ample concrete evidence from which a reasonable juror could infer that Mrs. Palazzolo was fired by Dr. Damsker in retaliation for reporting the wrongdoing and waste ongoing in the Health Department under his supervision in violation of the Whistleblower Law.  Accordingly, summary judgment with respect to Count I should be denied.

**B.** **Plaintiff Has Adduced Evidence Sufficient To Support Her Claim In Count II That She Was Discharged From Her Employment With Bucks County Because Of Her Age In Violation Of The Age Discrimination In Employment Act.**

Plaintiff agrees with the Defendants that, since the Defendants do not contest that Mrs. Palazzolo can establish a *prima facie* case of age discrimination for the purpose of their summary judgment motion, the Third Circuit's decision in *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994), in conjuction with the Supreme Court's decision in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), controls the determination of whether she can withstand summary judgment by adducing evidence that the Defendants' proffered nondiscriminatory reasons for its action are pretextual.

Mrs. Palazzolo may avoid summary judgment on her ADEA claim by producing circumstantial or direct evidence that discredits the Defendants' proffered reasons for their adverse employment action. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) ("a plaintiff's prima facie case [under the ADEA], combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."); *Fuentes*, 32 F.3d at 764. This evidence "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for the asserted non-discriminatory reasons.'" *Fuentes*, 39 F.3d at 765 (citations omitted).

Here, it is implausible, inconsistent, incoherent and contradictory for the Defendants to proffer that they fired Mrs. Palazzolo for not divulging to Dr. Damsker that she was in a meeting with the Deputy Controller on August 11 where she was instructed by the Deputy Controller not to divulge anything to anyone about the meeting. Mrs. Palazzolo was required to comply with

the Deputy Controller's instruction as a condition of her employment and not disclose such confidential information.  (Damsker Dep. 175, Damsker Dep. Exh. 8, Class I, ¶ 18; Hessenthaler Dep. 12-14; Dolan Dep. 5, 29-30).

To the extent the Defendants maintain that Mrs. Palazzolo nevertheless lied to Dr. Damsker when asked about her whereabouts and was fired for that reason, the fact is that Mrs. Palazzolo truthfully told Dr. Damsker that she went to see Walt Johnson on August 11 and that when she discovered that he was not in that day, saw Fonta Riley and Dave Buscola.  These facts must be accepted as true for purposes of the summary judgment analysis.  It is true that Mrs. Palazzolo's main purpose for being out of the office that afternoon was to meet with the Deputy Controller about the theft of time that was ongoing in the Health Department, but Mrs. Palazzolo was prohibited from divulging that fact to Dr. Damsker on August 11 or 12.  Accordingly, Mrs. Palazzolo was as truthful as she could have been at the time and did not lie to Dr. Damsker.  Viewing these facts in a light most favorable to Mrs. Palazzolo, the Defendants' proffered reasons for her termination are unworthy of credence.

Indeed, as set forth above, the record in this case is replete with evidence of other weaknesses, implausibilities, incoherencies, and contradictions in the Defendants' reasons for firing Mrs. Palazzolo that a factfinder could rationally find them unworthy of credence and hence infer that the Defendants did not act for the proffered reasons but because of Mrs. Palazzolo's age.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) ("a plaintiff's prima facie case [under the ADEA], combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.")

Accordingly, Defendants' motion for summary judgment with respect to Plaintiff's ADEA claim in Count II of the Second Amended Complaint should be denied.

**III.**     <u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff respectfully requests that the Defendants' motion for Summary Judgment be denied.

Respectfully submitted,

/s/ Edward S. Mazurek
Edward S. Mazurek (I.D. No. 50278)
The Mazurek Law Firm, LLC
717 S. Columbus Blvd.
Suite 516
Philadelphia, PA 19147
267.243.3393
emazurek@mazureklawfirm.com

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

### CERTIFICATE OF SERVICE

The undersigned, hereby certifies that a true and correct copy of the forgoing Memorandum of Law in opposition to Defendants' Motion for Summary Judgment was filed electronically through this Court's ECF System and is available for viewing and downloading from this Court's ECF System. The undersigned further certifies that an electronic copy of the foregoing Memorandum of Law was served upon counsel for Defendants through this Court's ECF System to the e-mail addresses listed in the Court's ECF System as follows:

FRANK A. CHERNAK    chernakf@ballardspahr.com

ALEXANDRA BAK-BOYCHUK    bakboychuka@ballardspahr.com

**February 16, 2012**                    **/s/ Edward S. Mazurek_____**

31